GROGAN MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 29050.    Filed April 28, 1954.

*John A. Osoinach, Esq.*, for the petitioner.
*Allen T. Akin, Esq.*, for the respondent.

164

172

174

OPINION.

Turner, *Judge:* It is the claim of the petitioner that a portion of its income in each of the taxable years 1941 and 1942 was the result of growth of its timber during the intervals between the dates of acquisition and the dates of harvesting, and that in computing its excess profits tax for those years, it is entitled, under section 721 of the Internal Revenue Code, to have such portion of its income attributed to the years in which the growth occurred.

That trees under natural conditions do grow, is not open to question. We think, also, that the record amply shows that petitioner, under its established methods of operation, was able, by reason of the continuing growth of the timber owned by it or to which it had cutting rights, to harvest greater quantities thereof than would have been the case if it had logged the tracts immediately after acquisition, or had been limited, when the tracts were logged, to the footage in the trees of the permitted sizes as of the dates of acquisition.

As to the portion or quantity of the timber cut in 1941 and 1942 which was attributable to such growth or the amount of the income resulting therefrom, the evidence of record does not readily lend itself to definite or satisfactory findings or conclusions. From Farmers' Bulletin No. 1517, United States Department of Agriculture, made of record by petitioner, we know generally that a loblolly pine in an open-grown stand, on average land, will have attained the permitted size for cutting herein at the age of 20 years, while in a

crowded stand it will require close to 30 years to attain that size.[8]   In numerous cases tracts of land have been logged at intervals of 12 to 15 years and a good cut of second growth timber obtained.   That was not due, however, to the cutting of trees 10 to 15 years old, but to the cutting of trees which had been left previously and which had grown to the proper size in the interval, since, if a good stand of young timber is not left, substantially longer intervals must elapse between cuttings.   We also know that where loblolly pine is left in its reseeding and growth to the processes of nature the land is likely to be under-stocked or overstocked, and that stands of timber left to grow as they will do not produce the best growth; and further, that thinning and proper cutting over a period of time will result in a substantially increased yield.   The rainfall, the depth and grade of the soil, and particularly its ability to hold moisture during the growing season, greatly affect the rate of growth of the trees, and generally loblolly pine should not be cut under 25 to 30 years of age, since the trees are, in the usual case, growing at their fastest rate between the ages of 18 to 25 years.

As to petitioner's holdings, we are advised as to practically none of the above facts, except that it did not undertake thinning operations or indulge in selective cutting, and that such growth as did occur resulted from the operation and effect of the forces of nature and not from affirmative action on petitioner's part.   Possibly the soil, in the main, was average east Texas soil, but that is only surmise.   We do know that the timber was second growth, but we are not advised as to whether it was largely in open-grown stands or in crowded stands. We have no information as to the time, average or otherwise, when the tracts were last logged prior to petitioner's acquisition of interests therein, how closely they had been logged, or whether at the time of acquisition the trees on the tracts were, in the main, of the permitted sizes for cutting or were saplings or seedlings.   We have been sup-plied with the number of tracts from which timber was cut in the said years, the dates on which the timber or timber rights were acquired, and the footage, Doyle-Scribner scale, of the logs actually cut and removed from the tracts in each of the taxable years.   As to most of the tracts, we have also been fairly definitely supplied with purported estimates of footage in timber of the permitted sizes on the tracts as of the dates of acquisition.   Petitioner does not base its computation of the quantity of growth timber claimed on these pur-ported estimates, however, and, as will more clearly appear here-

---

[8] This data is taken from Table 1 appearing on page 5 of the said Bulletin, part of which is set out in our Findings of Fact.   A somewhat slower growth for loblolly on a per acre basis seems to be indicated by Table 5, page 11, of the same Bulletin, showing the "amount of saw timber per acre * * * in well set, or medium dense, stands protected from fire and rightly thinned," part of which table is also shown in our Findings of Fact.

after, we do not regard them as indicative of the quantities of saw timber on the tracts at the contract dates.

Abandoning the flat 5 per cent growth rate contended for in its claims for relief and refund, the petitioner now takes the position that the quantity of timber cut in each of the years 1941 and 1942 which represented growth is, for the purposes here, to be determined at the rate of 8 per cent per annum, compounded annually. In applying that rate, however, it does not work from a footage figure for the timber on the tracts as of the dates of acquisition but works progressively backwards from the timber actually cut and removed from the tracts in the taxable years, by assuming that the actual cut represented 108 per cent of the quantity of saw timber which would have been harvested 12 months earlier, and so on, back to the date of acquisition. The residuum left by such a computation as the amount of saw timber on any given tract as of the date of acquisition would in most instances bear little resemblance to the amount shown by petitioner's records as the estimate thereof as of the contract date. By use of the 8 per cent rate, compounded, petitioner now asks that we find that of the timber cut in 1941, covered by contracts bearing dates from 1930 to 1939, inclusive, the amount to be regarded as growth timber is 3,622,703 feet, as against 2,266,664 feet on its refund claim. And of the timber cut in 1942, from tracts covered by contracts bearing dates from 1930 to 1940, inclusive, it now asks for a finding of 3,651,414 feet, as against 2,277,969 feet on its refund claim. This change of position is based on opinion testimony to the effect that the rate of growth for pine timber in east Texas is from 8 to 11 per cent per annum. No reference was made in the testimony, however, to any rate compounded annually. Although the opinion expressed was that of one of petitioner's directors, no explanation is offered as to why in making its claims for relief and refund, which were the claims administratively considered by the respondent, the growth rate was represented to be a flat 5 per cent per annum.

The petitioner has likewise abandoned the method used in its refund claims for computing the amounts of its profits for the years 1941 and 1942 which it claims resulted from growth. It has discarded its claim that the profit attributable to growth is to be arrived at by applying the rates at which it was buying stumpage in those years to the footage of the claimed growth timber harvested. Its position now is that the cost per thousand board feet of the timber on the various tracts decreased as the quantity of saw timber thereon was increased by growth, and that the amount of the profit for each of the taxable years which is to be attributed to growth is to be found by applying the amount by which its cost per thousand board feet was so decreased to the total footage of timber actually cut from the tracts in the taxable years.

Aside from any question of its soundness, a major difficulty with that approach is that the cost figures used by petitioner in arriving at the margin by which it claims its cost per thousand board feet of the timber cut was decreased by reason of timber growth are not substantiated by the evidence for what they are represented to be. As the cost of the saw timber on the tracts as of the dates of acquisition, the petitioner has used $4.56 per thousand feet for the tracts from which timber was cut in 1941, and $4.58 for the tracts from which timber was cut in 1942. In arriving at the figures stated, petitioner has treated its total outlay, including original cost, commissions, and subsequent extension payments, as the cost of the saw timber on the tracts as of the dates of acquisition and none of it as the cost of the growth timber actually harvested, and as to the quantity of the saw timber on the tracts as of the dates of acquisition, it ignores the results shown both by its growth figure of 5 per cent flat, as used in its claims for refund, and its presently claimed growth figure of 8 per cent, compounded annually, and treats the amounts shown by its original estimates as being the quantity of timber of the permitted sizes on the tracts when acquired. Aside from this inconsistency as to the portions of the timber cut which represented growth timber and timber "purchased," it is apparent from the evidence, we think, that the estimates of the quantity of saw timber on the tracts as of the contract dates are unrealistic to such a degree that they may not be accepted as representing the quantities of timber of the permitted sizes which actually were there as of those dates. To illustrate, the percentage of actual cut to estimate on the tracts logged exclusively in 1941 varied from a high of 689 per cent, for a tract on which the timber or timber rights were acquired 5 years before, to a low of 49 per cent, for a tract on which the timber or timber rights were acquired 2 years previously. Variations between these two extremes show almost any result which may be imagined. Although the record discloses that petitioner had no serious forest fires or infestations by insects or tree diseases in its timber during the period from 1930 to 1942, the evidence shows that as to 12 out of 31 of the tracts having contract dates in 1939, the actual cut 2 years later did not equal the estimates, the percentages ranging from the 49 per cent figure, previously mentioned, to 96 per cent. In contrast, as to 9 of those remaining, the percentages ranged from 166 per cent to 283 per cent. The facts being as they are, the only reasonable conclusion would seem to be that either those who made the original estimates were not so expert as represented, or the results carried into petitioner's records by reason of those estimates were prompted by some consideration other than that of undertaking to show substantially the correct amount of timber of the permitted sizes actually on the tracts as of the contract dates.

As the cost per thousand board feet for all of the timber cut in 1941 and 1942 from the tracts in question, including both growth timber and timber "purchased," the petitioner has used in the above computation, $2.56 per thousand board feet as "1941 cost of timber used" and $3.25 per thousand as "1942 cost of timber used." The record shows that these figures represent the average cost per thousand of "the entire timber price" as shown by the timber account on petitioner's books, at the time of charge-out, which was either at the end of each month or the end of the year. In arriving at the rates for charging-out timber when cut, the entire timber price was spread to cover the quantities of timber which, for income tax purposes, had been added from time to time to cover accretion by timber growth, as well as the quantity of timber shown by petitioner's records as having been purchased. In other words, as we understand them, the figures indicated represented the rate per thousand board feet at which petitioner's entire timber holdings, including the estimated quantities as of the dates of acquisition as well as the amounts added for accretion, stood on the petitioner's books as of the dates of charge-out. We do not know the range of the dates of acquisition of the timber still in the account in 1941 and 1942, the range of the prices at which the various estimates of timber were carried into the timber account, whether or not the timber on petitioner's fee lands was included, and, if so, what adjustment was made for the land itself, or how the quantities which had been added to cover accretion had been arrived at or whether the amounts so added bear any relationship to the 5 per cent rate, as shown by petitioner on its claims for relief and refund, the 8 per cent rate, compounded annually, now contended for on brief, or some other rate. Just why, for the purposes of this proposed computation, the petitioner chose to use the above figures as the cost per thousand board feet of the timber actually cut from the various tracts is not readily apparent, particularly since the record does show as to most of the tracts from which timber was cut in 1941 and 1942 the total cost of the timber cut, which cut included both the growth timber and timber "purchased," and with such figures there would be no difficulty, certainly, as to the tracts cut exclusively in 1941 and 1942 in showing the actual cost per thousand board feet of the timber harvested.

From the above, we think it apparent that by reason of certain variances between the factual representations in the claims for relief filed by petitioner with the respondent, and administratively considered by him, and the claims now made in this proceeding, a lurking question is whether the situation here falls within and is controlled by our holding in *Blum Folding Paper Box Co.*, 4 T. C. 795. It is also apparent, we think, that even though the amount of peti-

tioner's cut of timber in the taxable years was in some part due to enhancement by natural growth occurring during the interval between the dates of acquisition and the dates of harvest, petitioner has not established either the quantity of such growth or the amount of its income in the taxable years which resulted therefrom, and any determination of such amounts by us would of necessity be after the manner indicated in *Cohan* v. *Commissioner*, 39 F. 2d 540. The fact that petitioner did have income in some amount resulting from the growth of timber, as claimed, would not, however, establish its right to the relief sought, or any part thereof. The income still must be abnormal income within the meaning of section 721 (a) (1),[9] and the net abnormal income or some portion thereof must be attributable, under section 721 (b),[9] to prior years in which the growth occurred.

Under section 721 (a) (1), the existence and amounts of abnormal income are to be determined according to classes of gross income, and under that section abnormal income means income of any class of the taxpayer's gross income if it is abnormal for the taxpayer to derive income of such class, or, if the income is of a class which it is normal for the taxpayer to receive but the amount of gross income of such class for the taxable year is in excess of 125 per centum of the average amount of such gross income for the 4 previous taxable years, then the excess is, for the purposes of section 721, to be regarded as abnormal income. In section 721 (a) (2), Congress has listed various situations in which, for the purposes of section 721 (a) (1), income is to be regarded as a separate class of income, one such separate class of income being described in section 721 (a) (2) (C)[10] "as the income resulting from * * * development of tangible property * * * extending over a period of more than 12 months."

[9] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

\* \* \* \* \* \*

(b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary. \* \* \*

[10] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

\* \* \* \* \* \* \*

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

\* \* \* \* \* \* \*

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months; \* \* \*

The petitioner has bottomed its claims for refund and the presentation of its case here on the proposition that a portion of its income in 1941 and 1942 was attributable to the natural growth of timber between the dates of acquisition and the dates of harvesting, and that such growth was the "development of tangible property" within the meaning of section 721 (a) (2) (C), making such part of the income as did result from growth [11] abnormal income, which, for excess profits tax purposes, is to be attributed to the years in which such growth occurred.

In denying petitioner's claims for refund, the respondent determined that the natural growth of the timber between the dates of acquisition and the dates of harvest was not the "development" of the property by the taxpayer within the meaning of section 721 (a) (2) (C), as claimed. In so concluding, he relied on the provision in section 35.721–7 of Regulations 112, to the effect that the "development" relied upon must be that of the taxpayer.

The difficulty with the claim so made is that it does not follow that such income as may, on the record here, be said to have resulted from the growth of timber during the period it or the timber rights were owned by petitioner, was abnormal income under the statute, even if it should be conceded or assumed that the natural growth during the period of its ownership was the "development of tangible property" within the meaning of section 721 (a) (2) (C). That would merely mean that the income which did result from the growth of timber was a separate class of income, and whether or to what extent it was abnormal income under the statute would be dependent upon the results after application of section 721 (a) (1). In that respect, the record amply shows that such of the petitioner's 1941 and 1942 income as may be said to have resulted from growth was not abnormal as to class, since it was, and had been, perfectly normal over the years for petitioner, under its established methods of operation, to harvest timber from tracts in respect of which it had previously acquired the timber or timber rights, and to realize income on and from such increase as had occurred by reason of the natural growth of the timber between the dates of acquisition and the dates of cutting or logging. If, then, there was abnormal income in the taxable years from growth, it was not because it was abnormal as to class but because petitioner's gross income which was from growth was abnormal in amount when compared with the average amount of the gross income from growth for its 4 previous taxable years.

While the petitioner did undertake to prove the portion of its income for 1941 and 1942 which was the result of growth of the timber

[11] In its reply brief, the petitioner specifically disavowed any claim for relief "as to income arising from the timber originally purchased."

after the dates of its acquisition of the timber or timber rights, and it takes the position that the proof on which it relies does reasonably establish such income, it has not offered any proof to show the amount of the income received by it in the 4 previous taxable years which was due to timber growth during the holding period, and it is accordingly not possible to determine the amount, if any, of abnormal income realized by the petitioner in the years before us which could be said to have resulted from such growth or development. And being unable to say that petitioner had any abnormal income, as claimed, it becomes unnecessary to consider and decide the portions of petitioner's 1941 and 1942 income which might be said to have been the result of the growth of the timber in prior years, or to determine as a matter of law whether the income for the taxable years from growth timber was income resulting from the development of tangible property within the meaning of section 721 (a) (2) (C).

Reviewed by the Special Division.

*Decision will be entered for the respondent.*

